**UNITED STATES of America**

v.

**Paul HILL.**

**Crim. No. 79–161.**

United States District Court,
E. D. Pennsylvania.

Dec. 26, 1979.

Daniel B. Huyett, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Hardy Williams, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

Paul Hill was charged with distributing heroin on six specific dates between March 13 and June 18, 1979, and with conspiracy to distribute heroin. He was found not guilty of Count I, conspiracy, and not guilty of Count II, which referred to the first date of distribution, March 13, 1979. Defendant did not deny those acts which would constitute the offense, but claimed that he was entrapped by government agents. Presently before the court are defendant's motion for judgment of acquittal or for a new trial. I find no merit in his contentions and for the reasons which follow, his motions must be refused.

Ian Daniels testified that he was paid to provide information to the government about traffickers in drugs. Hill and Daniels were casual acquaintances—so casual, in fact, that Hill could not remember Daniels' name when Daniels contacted him at the men's clothing store where Hill worked. According to his own testimony, Hill immediately asked Daniels for a marijuana cigarette. Daniels then told Hill he was interested in buying heroin and asked Hill to help him obtain it. Hill testified that although he had smoked marijuana and taken cocaine, he had never used heroin nor had he ever been involved in its sale.

According to the defendant, there were three, four, or five occasions in the next few days when he saw Daniels and in addition, there were three telephone conversations. In these contacts, Hill said Daniels tried to get him to supply heroin. Hill became impressed by Daniels' need to obtain the heroin and as a result, contacted Leonard Newton (his co-defendant) whom he knew to be a dealer in illegal drugs. Hill explained that Newton was a good customer of his at the clothing store, one who spent a lot of money, drove a big car, and had a nice apartment which Hill had visited on several occasions. More significantly, Hill knew that Newton dealt in both marijuana and cocaine. In view of Daniels' need, Hill decided to get Newton and Daniels together as a favor. He told Newton about Daniels. Newton said he felt he could supply Daniels' need and gave Hill a small quantity of heroin as a sample which Hill passed on to Daniels.

Daniels then introduced Hill to Jerome Harris, and later to Miles Edwards, both of whom were undercover police officers working with the Drug Enforcement Administration. Subsequently Edwards explained to Hill that although Harris and Daniels might make minor purchases for him, he, Edwards, was the one who would handle large transactions. There were five ensuing purchases, the largest on June 18, being for $24,000. immediately after which Hill and Newton were arrested. As time passed, Daniels' role in contacts with Hill had become less frequent, and Daniels was not even present for the distributions which took place on April 23, June 12, and June 13. In fact, Hill even admitted telling Edwards not to bring Daniels to Newton's apartment any more—apparently because the apartment had been raided and Newton thought that Daniels might have been responsible for tipping off the authorities. On the other hand, Hill took an active role in each of the sales.

1. Whether or not entrapment on the first date of distribution so pervaded the other incidents was a jury question.

Hill first contends that the not guilty verdict on Count II can only be interpreted as a finding that he was entrapped into making the first heroin distribution. It follows, he maintains, that the taint of entrapment so pervades the other five transactions that he is entitled to a judgment of acquittal as to them. I disagree.

The focal point of the entrapment offense is not the nature of the government agent's conduct, but instead, the predisposition of the defendant to commit the crime with which he is charged. *United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366, 371 (1973). I told the jury it would have to consider the evidence as to each count separately, and that it would also have to consider whether or not the pressures exerted by Daniels, which only concerned the obtaining of the initial sample, carried over from the first distribution to the second, or to the third, and so on. In short, I submitted to the jury the question as to whether or not the conduct of the government informant, Daniels, if it amounted to entrapment, so pervaded the subsequent events as to make them all a part of the first and thus illegal. In *United States v. West*, 511 F.2d 1083 (3d Cir. 1975), an informant provided West with drugs which in turn were purchased by a government agent. Thus, the government provided the drugs which the defendant was accused of selling. The Court of Appeals held that two counts of distribution could not stand under these circumstances.[1] However, the government's involvement with the defendant did not preclude his being found guilty on a third count of possessing drugs not supplied by the government.

In the instant case, the entrapment issue was fully and fairly submitted to the jury as to each count. While it is true that the logical interpretation of the finding of not guilty on Count II is to sustain the entrapment defense as to that count, Hill's own explanation of his actions after March 13 established beyond any doubt his predisposition to sell drugs on the subsequent occasions.

Hill and Daniels were only casual acquaintances. On the other hand, Hill and Newton were close friends. Hill had been a guest at Newton's apartment on several occasions. After the contact with Officers Harris and Edwards was established, Newton paid Hill—and as Hill said, this money was a factor in his continued involvement. Finally, there was Hill's active role in the sales. He was not a mere conduit or passive passer—Hill made the arrangements, quoted prices, explained quantity discounts, related the number of cuts which the heroin would take, counted the money for Newton, made telephone calls to Newton to set up the actual meeting points, and in general, acted for and with Newton in the distributions that were made.

After the first distribution—the sample which Hill obtained from his co-defendant Newton—Daniels had a limited and decreasing relationship with Hill. He had introduced Hill to Edwards and Harris. It was to them that Hill turned and it was to them that he sold. The rewards—money—came from Newton.

Hill's position is basic: once entrapped, always entrapped, no matter how much time passes and no matter how changing circumstances may alter an initial relationship.[2] Hill presented no citation that this is the law nor suggested any reason why it should be the law. I could find no case to support that idea and no policy reason occurs to me as to why, under the facts here, the limited role played by Daniels should shield Hill from responsibility for his part in the subsequent events. Under the rule of *United States v. Russell*, supra, the focus of inquiry is on the defendant's predisposition, not the conduct of the government agent. Here the defendant did more and more, the informer less and less. The issue

---

1. In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Supreme Court held that even though a government agent supplied the drugs which the defendant sold to another government agent, defendant's conviction could stand if he was predisposed to commit the crime. In *West*, which predated *Hampton*, the court concluded that West was not predisposed to commit the crimes charged in the first two counts.

2. Although Hill cites *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 848 (1958), to support his contention, it does not do so. In *Sherman*, the later sales on which the convictions were based "were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement." *Id.* at 374, 78 S.Ct. at 822. Whether or not that was the fact in the instant case was a matter which I left to the jury and which it decided against Hill.

of the defendant's predisposition was for the jury.

After deliberating several hours, the jury returned with two questions, one of which asked, "If the defendant was entrapped could the defendant be not guilty of all counts," and the other of which asked, "Can defendant be guilty of counts II to VII (distribution) if entrapment was involved in any other count?" I stated to the jury that I interpreted their questions to be really one: If there was entrapment as to any one count, does that mean that there was of necessity entrapment as to all of the other counts? The jury affirmed that this was the question it was asking.

I then repeated to the jury that if it concluded the government had not carried its burden to prove that the defendant had not been entrapped as to the first date, March 13, it would then have to consider the evidence as to each of the other counts to see whether the activity, threats, persuasion, cajolery, promises, flattery, or whatever it was that constituted entrapment as it referred to the first purported distribution, carried over to the next time and the time thereafter and the time after that. I said it did not follow as a matter of law that this conduct had to carry over, but that the jury could find that it did so. I also pointed out that the jury would not have to reach that conclusion because it could take into account, for example, that after the first transaction, Hill had received money from his co-defendant Newton. I also told the jury that in considering the entrapment defense, it could consider not only what Daniels had said to Hill prior to March 13 but that which each of the other officers had said to Hill at any time thereafter.

These instructions were an appropriate response to the jury's question, and as previously pointed out, a correct statement of the law under the circumstances of this case.

2. No foundation was laid for the presentation of expert testimony.

The defendant also contends that I improperly excluded the testimony of his expert witness.

Just prior to the government's resting its case, the defendant sought to present evidence from Dr. Milton Brutten, a psychologist. Dr. Brutten had reviewed the intellectual and public school background of the defendant (who was then 33 years of age) and had also administered tests to the defendant. The defense was offering Dr. Brutten to testify as to the defendant's intellectual capacity to resist the pressure or urging of a skillful undercover informant here, Daniels. Originally counsel for the defendant believed that Dr. Brutten could not appear on any other occasion. Having learned that the prosecution's case would probably finish within a short time, I interrogated the doctor and found that he could be in court the next morning. Thereafter, the government rested and the defense called four brief witnesses, but not the defendant.

The following day the doctor appeared and was offered as a witness. However, he had not been present to hear Daniels testify, had never seen Daniels, had never had Daniels tested, and had not reviewed the testimony which Daniels had given. The defendant had not as yet been called to the stand and therefore the doctor obviously had not heard his testimony, nor could he know how Hill would respond to cross examination. I suggested to counsel for the defendant that Dr. Brutten remain in the courtroom so that he could at least hear Hill describe his various encounters with Daniels. Dr. Brutten, however, had other appointments and I was told he could not remain. I then refused to permit the doctor to be called to the stand.

■ Primarily, my ruling was based on the complete absence of any foundation for the testimony. Having heard neither the allegedly "cunning and skillful" entrapper nor the version of the facts given by the allegedly mentally disabled defendant, there was no basis on which the doctor could provide an expert opinion. Counsel for the defendant proposed to provide a hypothetical question which in effect would

have asked the doctor to give his opinion as to whether the defendant could have resisted the persuasion of a skillful and cunning man like Daniels. I refused the offer because Dr. Brutten had never seen Daniels nor did he know what Daniels had said. To have allowed Dr. Brutten to testify as to Hill's ability to resist Daniels' importuning would have required not only a knowledge of Hill, but also an equivalent knowledge of Daniels' mental ability. Dr. Brutten's complete ignorance as to Daniels could not have been overcome by Daniels' being characterized as skilled, cunning, communicative, or in any other way for the purpose of a hypothetical question. I did not refuse to permit the doctor to testify—I only insisted that there be some sort of minimal foundation for him to do so.

There was a second reason why Dr. Brutten's testimony was excludable. Counsel for the defendant made it very clear that he considered a crucial part of the entrapment defense to be the weakness of mind of the defendant and that Dr. Brutten's testimony would go right to the heart of that particular aspect of the case. At another point, counsel said that the doctor would testify in the terms of the defendant's intelligence capacity, inclinations, weaknesses, or strength of mind, all of which he felt were relevant in the entrapment field.

Fed.R.Crim.P.No. 12.2, Notice of Defense Based upon Mental Condition, provides in part:

> (b) . . . If a defendant intends to introduce expert testimony relating to a mental disease, defect, or *other condition bearing upon the issue* of whether he had the mental state required for the offense charged, he shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention . . . (emphasis supplied).

(c) . . .

(d) . . . If there is a failure to give notice when required by subdivision (b) of this rule . . . the court may exclude the testimony of any expert witness offered by the defendant on the issue of his mental state.

■ I conclude that predisposition to sell heroin is a mental condition which bears upon the issue of whether the defendant had the mental state[3] required for the offense charged here and thus notice of Dr. Brutten's testimony was required under Rule 12.2. There was no notice in this case. The government had only learned about the possibility of Dr. Brutten's being called the day before. Dr. Brutten testified that he was busy, that his appointments were booked hour by hour, two and three weeks in advance, and that it was difficult to change these appointments. I was not asked to allow him to testify at some other time but then and only then. Had I permitted him to do so, it would not only have meant that the government would not have been equipped to cross examine, but also, any expert called by the government would not have had a chance to hear Daniels, Hill, or Dr. Brutten. In addition, the government would have been deprived of any opportunity to investigate other aspects of Hill's life and work which might bear on his mental state or to obtain any other form of rebuttal testimony on that issue. Having considered the alternatives, I concluded that the failure of the defense to comply with Rule 12.2 made the exclusion of Dr. Brutten's testimony mandatory.

### 3. Defendant's Remaining Arguments.

■ Defendant contends that the example which I used to illustrate circumstantial evidence was prejudicial in light of the government's closing to the jury.[4] Counsel

---

**3.** Plainly "mental state," the term used in 12.-2(b) is broader than insanity, the term used in 12.2(a). Rule 12.2 has been held to apply to a defendant's "nonaggressive" nature, *United States v. Staggs*, 553 F.2d 1073 (7th Cir. 1977), and to a mental irresponsibility caused by alco-

hol, *United States v. Olson*, 576 F.2d 1267 (8th Cir. 1978).

**4.** Examples may be used to explain abstract legal concepts: *United States v. Armedo-Sarmiento*, 545 F.2d 785 (2d Cir. 1976), cert. denied, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d

took no exception to either or both at the time, and there is no merit in this argument. In addition, he maintains that the prosecutor's comment that the heroin in question had a street value of a quarter of a million dollars was inflammatory. I disagree. The jury had heard that the undercover officers paid almost $39,000. for heroin of a sufficient purity to allow an average of eight "cuts" or an expansion by a factor of eight before it would be sold to the ultimate user. In view of the drug's high purity and the dollar amounts involved in these purchases, the prosecutor's comment was fair argument. Moreover, it must be remembered that the jury spent considerable time in deliberation, asked a question, and found Hill not guilty on two counts of the indictment. Plainly this evidence of careful, reasoned deliberation shows the jury was not prejudiced against Hill.

595 (1977). I told the jury that if late one evening in a dim light I had seen a small figure in our kitchen and had concluded it was my son, Bobby, it would be an example of direct evidence. If later I went to the bedroom and saw that Bobby's twin, David, had cookie crumbs around his mouth and a piece of cookie on his pillow, from that circumstantial evidence I might conclude that it was David whom I had seen in the kitchen. The prosecutor, in closing to the jury, had said that the defendant had gotten caught with his hand in the cookie jar. The defendant, of course, in conjunction with his plea of entrapment had admitted participation in each of the heroin distributions.